**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>CORNELL-DUBILIER     ELECTRONICS, INC.,<br><br>                    Defendant. | Civil Action No. 12- 5407 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge**.**

 This matter comes before the Court by way of Plaintiff the United States' motion to enter a consent decree, filed on April 11, 2013.  (*See* Pl's Mot. to Enter Consent Decree, ECF No. 28.) The Government moved for approval of the proposed Consent Decree pursuant to 42 U.S.C. § 9622 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).  (*See id*. at 2, 5.)   The Motion was supported by Defendant Cornell-Dubilier Electronics, Inc (hereinafter "CDE").  (*See* Def's Mem. in Supp., ECF No. 113.)  Defendant's three insurers—Exxon Mobil Corporation (Exxon), Columbia Casualty Company and Continental Casualty Company, and Certain Exxon London Market Insurers (collectively, the "Intervenors" or the "Insurers")—all moved to intervene in opposition to the Motion.  (*See* Mot. Intervene, Mar. 29, 2013, ECF No. 21; Mot. Intervene, Apr. 11, 2013, ECF No. 29; Mot. Intervene, Apr. 12, 2013, ECF No. 31.)   The motions to intervene were referred to Magistrate Judge Hammer who granted the Intervenors permission to jointly file a single submission in opposition to the Motion on November 27, 2013.  (*See* Order Grant'g Intervention, Nov. 27, 2013, ECF No. 77.)  The Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

Because the Court provided both Parties with ample opportunity to present their arguments and submit evidence, and in recognition of CERCLA's policy favoring expeditious and fair settlement of claims, the Court forgoes a hearing on this matter and adjudicates this motion solely on the briefs pursuant to Federal Rule of Civil Procedure 78(b). *See, e.g.*, *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 209 (3d Cir. 2003) ("The Constitution does not require the court to conduct a full and formal evidentiary hearing to satisfy due process concerns."); *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994) ("Requiring hearings to review the reasonableness of CERCLA consent decrees as a matter of course would frustrate the statutory objective of expeditious settlement.").

## I.      BACKGROUND

### 1.      Cornell-Dubilier Superfund Site

CDE is an electronics manufacturer primarily engaged in the production of electrical capacitors.  Between 1936 and 1956, CDE leased and operated a 26-acre manufacturing facility (the Facility) located at 333 Hamilton Boulevard in South Plainfield, New Jersey.  (Prince Decl., April 3, 2013 ¶¶ 4-6, ECF No. 28.)  In 1956, CDE purchased the Facility from the previous owner, Dana Corp.  (Proof of Claim, Sept. 21, 2006 ¶ 35, ECF No. 109.  )  CDE subsequently sold the Facility in 1961, but leased it until 1962.

As early as 1939, CDE started using substances called polychlorinated biphenyls (PCBs) as a dielectric insulating agent in its capacitors.  (CDE Product Catalog, Sept. 1939, ECF No. 28.) None of the parties debates that, in order to impregnate the capacitors with PCBs, the Capacitors were submerged into PCB oils.  Next, the surface of each capacitor was cleansed of the PCB oils using solvents.  These solvents ultimately exited the Facility through its built-in drainage system.

Dysfunctional capacitor units were discarded in pits on the Facility grounds.  (Tr. of Court's Findings, Home Insurance Co. v. Cornell-Dubilier Electronics, Inc. 738:1-12, ECF No. 28.)

During the Second World War, most of the capacitors produced by CDE at the Facility were purchased by government contractors for the production of vital military equipment.  (Maj. General Roger B. Colton Mem. Nov. 2, 1942, ECF No. 28.)  Beginning in 1943, the United States stationed five full-time employees at the facility.  (*Id.* at 37.)  These included one "expediter," (Letter of Lt. Col. Hubard, 1943, ECF No. 28), and four testers.  (CDE Organization Chart, 12 Oct. 1943.)  Additionally, from 1944 to1946, the United States owned and operated capacitor-testing equipment at the CDE Facility.  The Government used its capacitor testing equipment to ensure that capacitors met military specifications.

### 2.      The EPA's Early Involvement at the Site

In 1994, the EPA first inspected the Facility, and found that PCBs had been released into the environment.  (Rotola Decl., March 22, 2013, ¶ 3, ECF No. 28.)  Subsequently, between March 1996 and January 1997, the EPA conducted a Removal Site Evaluation.  (*Id.*) The Removal Site evaluation confirmed the presence of PCBs in Site soil, surface water, and sediments.  (*Id.*)  The Site in question, officially referred to as the Cornell-Dubilier Electronics Superfund Site (the Site), comprises the 26-acre Facility formerly owned by CDE, several adjacent residential and commercial properties, and the adjoining Bound Brook corridor.  (Prince Decl., April 3, 2013 ¶¶ 4, 5.)  During an inspection of the Bound Brook, the EPA also "found elevated levels of PCBs in fish" and waterway sediment.  (*Id.*)  In 1997, the EPA found elevated levels of PCBs in soil and interior dust samples" in "nearby residential and commercial properties."  (*Id.*)  In 1998, the Site was added to the National Priorities List. (*Id.* at ¶ 10.)

Between 1998 and 2008, three separate EPA removal actions were undertaken at the Site. (*Id*. at 7, 8.) These actions served to stabilize and contain pollution at the Site pending a permanent remedy. (*Id*. at 8.) In 2000, the EPA conducted a Remedial Investigation and Feasibility Study for the Site. (*Id*.)

Based largely on the results of the Remedial Investigation and Feasibility Study, the EPA divided the Site into four Operational Units (OUs) and prepared Records of Decision (RODs) for each Operational Unit. The Records of Decision laid out the remedial plan for each distinct area of the site. (*See id*.) By September 30, 2012, the EPA had spent $166,913,665 on remediation at the Site. (EPA Cost Summary, Sept. 30, 2012, ECF No. 28.)

### 3. The Lawsuit and Negotiation of the Consent Decree

CDE first received notice of a potential CERCLA lawsuit in 1992. (Sanoff Cert., June 9, 2014, Ex. 1.) Between 1992 and 2003, CDE contacted its insurance providers on a number of occasions to inform them of the potential suit and request defense and indemnification. (*Id*.) The Insurers refused to participate, giving rise in 1996 to insurance coverage litigation in New Jersey state court. The state court litigation is currently ongoing.

The parties agree that, while the Government's remedial activities were underway at the Site, private settlement negotiations were initiated between CDE and the United States. When negotiations began, the Government had not yet made a final decision on remedial measures for some aspects of the Site. (Koch Report, March 15, 2013, ECF No. 28) However, with expert assistance, the United States estimated that the total cleanup cost for the Site, including all past and future cleanup costs, would be $365.5 million. (*Id*.) Expert assistance also provided the foundation for the Government's $239.7 million estimate for natural resource damages (NRD).

(MacDonald Report 18, ECF No. 28; Donlan Report 5, ECF No. 28.)  Through their negotiations CDE and the Government agreed upon the terms of a proposed Consent Decree.

In relevant part, the proposed Consent Decree calls upon CDE to pay to the Government a large portion of any award resulting from CDE's ongoing state court insurance coverage suit. (Consent Decree ¶¶ 16,17.)  The proposed Consent Decree also calls upon CDE to pay a total of $1,110,000 to the United States and State of New Jersey.  (*See id.* at 16.)  The Government is itself liable for payment of $16,282,685 for its role at the Site.  (Consent Decree ¶ 19.)

On August 28, 2012, the United States initiated the present CERCLA suit and simultaneously submitted the proposed Consent Decree for approval by the Court.  (*See* Pl's Mem. in Supp. 17.)  The United States filed a memorandum in support of the Motion On April 11, 2013. (Pl's Mem. in Supp.)  The Intervenors responded with a joint memorandum opposing entry of the proposed Consent Decree on April 25, 2014.  (Exxon's Mem. in Opp.)  On June 9, 2014, the Government and CDE both filed reply memoranda supporting entry of the proposed consent decree.  (Pl's Reply Mem. in Supp., ECF No. 115; Def's Reply Mem. in Supp., ECF No. 113.) The Court granted Intervenors permission to file a sur-reply, which the Intervenors did on August 22, 2014.  (*See* Order, July 30, 2014, ECF No. 121; Exxon's Sur-reply, ECF No. 125.)  Finally, the Government filed a short memorandum in response to the Intervenors' Sur-reply on August 29, 2014.  (Pl's Resp. to Sur-reply, ECF No. 126.)

## II.    LEGAL STANDARD

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "the Act") was passed in 1980 in order to "ensure the cleanup of the nation's hazardous waste sites."  *In re Tutu*, 326 F.3d at 206.  The Act encourages the use of Consent

Decrees as a means of advancing the public interest and minimizing litigation.  *See* 42 U.S.C. § 9622(a).  "A court should approve a proposed Consent Decree if it is fair, reasonable, and consistent with CERCLA's goals."  *United States v. Se. Pa. Transp. Auth.*, 235 F.3d 817, 823 (3d Cir. 2000).

In evaluating a proposed consent decree, courts must "take a broad view of the proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990).  Although courts owe deference to the "EPA's expertise and to [CERCLA's] policy of encouraging settlement," *Se. Pa. Transp. Auth.*, 235 F.3d at 822, "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances."  *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987).  "Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit [sic] at the table."  *Cannons Eng'g Corp.*, 899 F.2d at 84.

## III.  DISCUSSION

The Intervenors, led by Exxon, challenge the proposed Consent Decree on all three prongs: fairness, reasonableness, and consistency with CERCLA's goals.  For the reasons discussed below, the Court is not persuaded by any of the Intervenors' arguments challenging the proposed Consent Decree.

A.      **Fairness**

1.      **Procedural Fairness**

In evaluating the fairness of a proposed Consent Decree, the "court should assess both procedural and substantive considerations." *In re. Tutu*, 326 F.3d at 207.  "Procedural fairness requires that settlement negotiations take place at arm's length."  *Id*.  To determine whether a negotiation was procedurally fair, the court "should ordinarily look to the negotiation process and attempt to gauge its candor, openness and bargaining balance."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990).

Exxon argues that the negotiation process was procedurally unfair because "[t]here is no evidence of any serious negotiation on the part of [Defendant, CDE]."  (Exxon's Memo. in Opp. 14, ECF No. 109.)  Exxon claims that CDE's and the Government's interests were not truly adverse, and that the parties colluded to foist an inflated share of the overall cost onto the insurers. (*Id*. at 15)  To support its argument, Exxon claims that CDE never so much as challenged the projected cleanup costs, the calculated natural resources damages (NRD), or the allocation of liability between the parties.  (*Id*. at 14.)  Indeed, Exxon goes so far as to question whether CDE was even informed of these figures before agreeing to the negotiated settlement.  (*Id*.)  For the reasons given below, the Court finds these arguments unconvincing.

Contrary to Exxon's arguments, there is substantial evidence in the record that indicates the negotiations between the Government and CDE were candid, open, and balanced.  As the Government points out, both parties were represented by competent counsel with years of experience working on issues involving CDE and the South Plainfield Site in various state and federal level proceedings.  CDE retained its own environmental consultancy firm, and the information provided by that firm indicated that the Government's estimates for cleanup costs and

7

NRD were conservative.  (Sanoff Cert., June 9, 2014, ¶ 20, ECF No. 14.)  Likewise, the Government also retained its own independent consultants and relied upon the considerable expertise of the Environmental Protection Agency in arriving at its conclusions.  (MacDonald Report, ECF No. 28; Donlan Report, ECF No. 28; Koch Report, March 15, 2013.)

Additionally, CDE lays out the specific reasoning that led CDE to agree to the settlement.  (Def's Mem. in Supp. 11, 12.)  For example, CDE's previous experiences with other sites contaminated by PCBs indicated that cleanup cost estimates would likely continue to rise as more information regarding the extent of pollution became available.  (Sanoff Cert. June 9, 2014, Ex. 17, ECF No. 113.)  This experience justified CDE's desire to reach a speedy conclusion to negotiations.

The Government argues that the negotiation was conducted at arm's length, and points to the adverse interests of the parties as evidence of that fact.  (Pl's Mem. in Supp. at 26.)  Specifically, the Government argues that CDE sought to reduce its overall liability for the site, whereas the Government wished to hold CDE 100% liable.  (*See id*.)  Additionally, the Government argues that CDE "sought to retain a higher percentage of insurance proceeds" whereas the Government tried to maximize its own share of the insurance proceeds.  (*Id*.)

The Government's arguments indicate some degree of adversity between the Government and CDE, but they do not suggest that either party had an incentive to reduce the amount of the settlement.  Indeed, as the Government notes, the parties agreed to divide the insurance proceeds between themselves.  (Consent Decree 17.)  Under such circumstances, both parties would appear to have an incentive to increase the total amount of the insurance proceeds.  In a CERCLA case where the parties to a consent decree negotiation do not harbor sharply conflicting interests, the settlement receives less deference from the Court.  *See In re Tutu*, 326 F.3d at 208.  However, the

mere fact that the parties' interests were not totally adverse is not sufficient to outweigh the other evidence in the record tending to show that the negotiations were candid, open, and balanced.

Exxon also claims that the proposed Consent Decree is procedurally unfair because the settlement negotiations were conducted in secret and excluded CDE's insurers.  (*See* Exxon's Mem. in Opp. 15.) This argument is unpersuasive because Exxon fails to establish any right to participate in settlement negotiations with the EPA.  *See, e.g.*, *Cannons Eng'g Corp.*, 899 F.2d at 84 ("The CERCLA statutes do not require the agency to open all settlement offers to all PRPs . . . . Under the SARA Amendments, the right to draw fine lines, and to structure the order and pace of settlement negotiations to suit, is an agency prerogative."); *United States v. Grand Rapids, Michigan*, 166 F. Supp. 2d 1213, 1221 (W.D. Mich. 2000) ("Even if Intervenors had been excluded from the settlement, such exclusion would not indicate procedural unfairness. CERCLA does not require the EPA to open all settlement offers to all PRPs.").

### 2.    Substantive Fairness

"Substantive fairness requires that the terms of the Consent Decree [be] based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused.'"  *In re Tutu*, 326 F.3d at 207 (quoting *Se. Pa. Transp. Auth.*, 235 F.3d at 823).   "As long as the measure of comparative fault on which the settlement terms are based is not 'arbitrary, capricious, and devoid of a rational basis,' the district court should uphold it."  *Se. Pa. Transp. Auth.*, 235 F.3d at 824 (quoting *Cannons Eng'g Corp.*, 899 F.2d at 87).

Exxon makes four arguments challenging the substantive fairness of the proposed Consent Decree.  First, Exxon argues that the EPA failed to adequately pursue other sources of pollution in the Bound Brook region.   Second, Exxon argues that the allocation of 2.4% liability to the

Government grossly understates the pollution generated as a result of the Government's ownership of capacitor testing equipment at the CDE facility.  (Exxon's Mem. in Opp. at 21.)  Third, Exxon argues that the Government should be liable as a prior operator of the CDE facility.  (*Id*. at 21-22.)  Finally, Exxon argues that the Government should be held liable as a prior arranger for the CDE facility.  (*Id*. at 29.)

### a.   The EPA's Investigation of Other Potentially Responsible Parties

Exxon first argues that the proposed Consent Decree is substantively unfair because the EPA failed to follow the guidelines set forth in the EPA's own PRP Search Manual.  (*See* Exxon's Sur-reply 8, 11.)  Exxon points out that "in some circumstances an agency's noncompliance with its own guidance can be a basis to find its actions arbitrary and capricious,"  (*Id*. at 10 (quoting *Nat'l Mitigation Banking Ass'n* v. *U.S. Army Corps of Eng'rs*, 06-CV-2820, 2007 WL 495245 (N.D. Ill. Feb. 14, 2007)) , and compares the present case to *Rhodes v. Johnson*, in which the Seventh Circuit held that the U.S. Forest Service was required to follow its own Environmental Policy and Procedures Handbook, and produce an "environmental assessment before conducting controlled burns or shrub removal in Burke Branch." 153 F.3d 785, 790 (7th Cir. 1998).

Exxon's argument is unavailing because the current case differs from *Rhodes* in a number of key ways.  First, contrary to the PRP Search Manual in this case, the handbook in *Rhodes* was published in the Federal Register and treated by both Parties and the Court as a set of agency regulations.  *See id*. at 788.  Second, the specific rule at issue in *Rhodes* was the Forest Service's interpretation of the National Environmental Policy Act's specific requirement "that all agencies make a report on the 'environmental impact of the proposed action' whenever the agency proposes action 'significantly affecting the quality of the human environment.'"  *Id*.  (quoting 42 U.S.C. §

4332(2)(C)).  Lastly, the language used in the handbook in *Rhodes* "unambiguously" required the creation of an environmental assessment, "leav[ing] no room for [any other] possibility."  *Id.* at 790.

Unlike the Handbook in *Rhodes*, the EPA's PRP Search Manual is merely an internal document intended "as a reference tool for EPA, state, and tribal staff members."  (*See* PRP Search Manual 1, ECF No. 125.)  Likewise, Exxon presents no argument—and the Court sees no evidence—suggesting that the particular procedures enumerated in the PRP Search Manual represent the EPA's interpretation of a specific congressional mandate regarding the search for PRPs.  Finally, the language of the Manual is clearly permissive rather than mandatory: the Manual states that the "EPA should provide PRPs the opportunity to participate," and "A PRP investigation should be part of the removal site evaluation."  (*Id.* at 52, 62.)  The Manual's use of the word "should" as opposed to "shall" or "must" indicates a recommendation rather than an imperative.  *See, e.g.*, *United States v. Swan*, 275 F.3d 272, 278 (3d Cir. 2002) (agreeing with the Second Circuit that "the common meaning of 'should' 'suggests or recommends a course of action.'"); *United States v. Tisdale*, 248 F.3d 964, 977 (10th Cir. 2001) (contrasting permissive use of "should be" with mandatory use of "shall"); *United States v. Whiteley*, 54 F.3d 85, 89 (2d Cir. 1995) (holding that phrase "should consider" represents a retreat from the mandatory "shall impose").

Contrary to Exxon's arguments, there is sufficient evidence in the record to indicate that the proposed Consent Decree's allocation of liability has a rational basis and is neither arbitrary nor capricious.   The EPA sent formal Requests for Information to all former tenants of the CDE facility that could be identified, and received and evaluated more than seventy responses.  (Prince Decl., June 6, 2014 ¶ 32.)  The EPA and its consultants evaluated the potential contributions of sources outside of the immediate area of the Site.  (*Id.* at ¶ 33.)  Where the EPA could find no

11

evidence linking a potential source to the CDE Superfund Site—either because the potential source did not use PCBs or because environmental factors made such a link highly unlikely—the EPA eliminated that source as a potentially responsible party.  The Court is satisfied that the EPA's search for additional PRPs was conducted rationally and was sufficient to meet the standards of substantive justice.

**b.      The Government's Liability as a Prior Owner**

A party is subject to liability as a prior owner of a facility when, "'at the time of disposal of any hazardous substance,' it 'owned or operated any facility at which such hazardous substances were disposed of.'"  *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 383 (3d Cir. 2013) (quoting 42 U.S.C. § 9607(a)(2)).  Under CERCLA, a facility is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or
>
> (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

42 U.S.C. § 9601(9).

All the parties agree that the Government is subject to owner liability for any discharges of pollution that originated from Government-owned capacitor testing equipment present at the site between 1944 and 1946.  (Pl's Mem. in Supp. 36.)  However, Exxon argues that the allocation of 2.4% liability to the Government grossly understates the Government's share of liability.  (Exxon's Mem. in Opp. at 21.)  This argument is unpersuasive because the 2.4% figure has a rational basis

and was the product of a thorough and searching review of the Government's activities in the Bound Brook Region.

The settling Parties agreed that the Government could only be subject to liability for toxic substances discharged from government-owned capacitor testing equipment that was present at the CDE facility during the period between 1944 and 1946.  (*See* Pl's Mem. in Supp. 36.)  Where available, the settling Parties used contemporary evidence to determine the Government's possible contribution to pollution at the Site.  For example, the settling Parties consulted Government standards for military-grade capacitors, published in 1943, to determine what tests the Government's agents would have carried out at the facility.  (*See* Proposed American War Standard: Fixed Paper Dialectric Capacitors, 1943, ECF No. 28 (laying out Government standards for capacitor testing). )  The settling Parties estimated that the Government was responsible for 30% of discharged PCBs at the CDE facility by comparing the estimated pollution discharged by CDE's manufacturing process with the estimated pollution produced by the Government's testing process.  This 30% figure arrived at by the settling is consistent with previous cases divvying responsibility between facility owners and operators.  *See United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir. 1991).  The Government's 30% liability over two years, prorated over the 26 years of pollutive activity at the site, left the Government with 2.307% liability for all the pollution in the Bound Brook watershed, from which the parties rounded up to 2.4%.  (*See id*. at 37-38.)

### c.      The Government's Liability as a Prior Operator

Next, Exxon argues that, in addition to the Government's liability as a prior owner, the Government should be held liable as a prior operator of the CDE facility.  Exxon's argument fails because the settling Parties clearly and systematically address each aspect of the United States'

wartime role at the CDE facility, and show that the Government lacked operational control over pollution-related aspects of the facility.

In the CERCLA context, an "operator" is one who "manage[s], direct[s], or conduct[s] operations specifically related to the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods*, 524 U.S. 51, 52 (1998). In other words, "the Court must examine the degree of control the alleged owner/operator [was] able to exert over the activity causing the pollution." *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1127 (D. Idaho 2003) *modified in part sub nom. United States v. Asarco Inc.*, 471 F. Supp. 2d 1063 (D. Idaho 2005). "CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000). Particularly in cases such as this, where the issue dates back to the 1940s and direct evidence is rare, the Court must rely upon circumstantial evidence. *See id.*

Except with respect to government-owned capacitor testing equipment, the record indicates that the Government never exercised the kind of control over the CDE facility that is typically associated with operator liability. For example, although Government agents submitted recommendations to CDE's management for the purpose of improving efficiency and security at the facility, there is no evidence that these recommendations were ever carried out, and no evidence that the Government's recommendations were treated as imperatives. (Howard N. Hine Letter, April 24, 1943, ECF No. 115.)

In short, the Court concludes that, based on the evidence available in the record, there is clearly a rational basis for the settling Parties' decision not to hold the Government accountable as a prior operator of the CDE facility. *See, e.g.*, *Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1127 (holding the United States not liable as an operator despite significant wartime control over zinc

14

and lead mines); *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1277, 1285 (E.D. Cal. 1997) (holding the United States not liable for operator liability where the Government did not have authority to participate in day-to-day management); *E. Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479, 486 (D.C. Cir. 1998) (holding the United States not liable for operator liability despite significant wartime control and threat of seizure by the Government).

### d.     The Government's Liability as a Prior Arranger

Finally, Exxon argues that the Government should be liable as a prior arranger for the CDE facility.  (Exxon's Mem. in Opp. 29.)  CERCLA refers to an arranger as "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person." 42 U.S.C. § 9607(a)(3).  "[A]n entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009).  "In some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, [but] knowledge alone is insufficient to prove that an entity "planned for" the disposal." *Id.* at 612.

In the present case, there is evidence suggesting that the Government had knowledge that rejected capacitors were being dumped in pits at the CDE facility.  In Particular, aerial photographs from the site dating from the 1940s along with testimony from a former employee indicate that disposal pits were present at this site prior to and during the Government's involvement.  (*See* Wayne M. Grip Stmt. of Op. 3, ECF No. 109; Sevigny Dep., Feb. 23, 2005 21:1-20, ECF No. 109.) However, mere knowledge that an entity's product will be disposed of is not sufficient to establish

arranger liability.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 611 (2009) ("knowledge alone is insufficient to prove that an entity 'planned for' the disposal."); *Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 493 (D.N.J. 2009) ("arranger liability under § 107(a)(3) requires an intent to dispose of hazardous substances.").  Nothing in the record indicates that the Government took intentional steps to dispose of any pollutants at the facility.  In light of this lack of evidence, the Court concludes that the settling Parties had a rational basis for finding the Government not liable as a prior arranger for CDE.

### B.    Reasonableness

To determine the reasonableness of a proposed Consent Decree, a court must look to a number of factors.  First, and most importantly, the court must examine "the decree's likely efficaciousness as a vehicle for cleansing the environment."  *Cannons Eng'g*, 899 F.2d at 89-90.  Second, the court must consider whether the decree "satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures."  *Id*. at 90.  Third, the Court must consider "the relative strength of the parties' litigating positions," *Id*., as well as "the complexity, expense and likely duration of the litigation."  *Rohm & Haas*, 721 F. Supp. at 680 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  Finally, "[a] settlement may be deemed unreasonable . . . if it is based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise."  *United States v. Acton Corp.*, 733 F. Supp. 869, 872 (D.N.J. 1990) (citing *Rohm & Haas,* 721 F. Supp. at 686).

### 1.   Likely Efficaciousness as a Vehicle for Cleansing the Environment

When examining "the decree's likely efficaciousness as a vehicle for cleansing the environment," courts normally defer to the settling agency's expertise as long as the "figures relied upon derive in a sensible way from a plausible interpretation of the record." *Cannons Eng'g Corp.*, 899 F.2d at 89-90.  Where the cleanup has not already occurred, and the costs are estimates relating to a future cleanup, the question of efficaciousness becomes one of "technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses." *Id*.

 In the present case, the $365,516,812 figure arrived at by the settling parties for total response cost clearly derives in a sensible way from a plausible interpretation of the record.  This figure represents reimbursement for cleanup costs already incurred by the EPA, as well as reimbursement for projected future cleanup costs that will be incurred by the EPA in the future. (Koch Report, March 15, 2013, ECF No. 28; Prince Decl., June 6, 2014, ECF No. 115.)  In reaching this figure, the EPA relied upon the estimate of an independent expert, (Koch Report 1), as well as the expertise and experience of its own staff.  (Perez Decl. March 27, 2013, 5:13, ECF. 28.)

Exxon argues that the proposed Consent Decree is unlikely to cleanse the environment because its ability to fund remediation is largely contingent upon the outcome of a potentially lengthy state court insurance coverage action.  This argument is unpersuasive because the mere fact that recovery of a large portion of remedial costs is contingent is insufficient to render the proposed Consent Decree an unlikely vehicle for cleansing the environment.  The settling Parties were both aware that CDE could not pay the full cost of remediation for the CDE Superfund Site. (*See* Def's Mem. in Supp. 5; Pl's Mem. in Supp. 46.)  Under such circumstances, it is hardly surprising that the Government should seek reimbursement from CDE's only asset capable of

covering the costs of remediation: CDE's environmental insurance. (*See* Def's Mem. in Supp. 24; Pl's Mem. in Supp. 7.)

### 2.  Satisfactory compensation for the public

The second factor that a court must consider in determining the reasonableness of a proposed Consent Decree is whether the Consent Decree "satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures." *Cannons Eng'g Corp.*, 899 F.2d at 90. Due to the imprecise nature of this evaluation, "the court should normally defer to the agency's expertise" so long as "the figures relied upon derive in a sensible way from a plausible interpretation of the record." *Id*.

No argument has been put forth by any party challenging the proposed Consent Decree's adequacy with respect to compensating the public. Exxon argues that the Consent Decree *overcompensates* the public. (*See* Exxon's Mem. in Opp. 2, 38,) By so arguing, Exxon apparently misses the point of this prong of the reasonableness inquiry. *See Cannons Eng'g Corp.*, 899 F.2d at 90. ("Insofar as [Appellants] contend that the settlements are not designed to assure adequate compensation to the public for harms caused—at times, they seem to argue that the settlements overcompensate—they are whistling past the graveyard."). To be sure, the amount of NRD called for in the proposed Consent Decree is significantly lower than the estimated value of damages at the Site. (*See* Pl's Mem. in Supp. 18, n.36.) However, the issue of adequacy does not only turn upon "how close a settlement comes to meeting a scientifically defined ideal," rather it is a "pragmatic concept," requiring "common sense, practical wisdom, and a dispassionate assessment of the attendant circumstances." *Charles George Trucking, Inc.*, 34 F.3d at 1085 (1st Cir. 1994).

In this case, the reduction was not made arbitrarily, but in response to realistic and supportable litigation risks and uncertainties.

### 3.      Relative Strengths of the Parties' Litigating positions

The fourth factor to consider in evaluating the reasonableness of a proposed Consent Decree is "the relative strength of the parties' litigating positions," *Cannons Eng'g*, 899 F.2d at 90, as well as "the complexity, expense and likely duration of the litigation." *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680 (D.N.J. 1989) (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). In the present case, the risks and delays of litigation militated strongly in favor of speedy settlement. For CDE, which faced the prospect of two concurrent litigations with rising damages estimates in the hundreds of millions, the risks involved in litigating the suit substantially outweighed the benefits. (Sanoff Cert., Ex. 8, 2:3-3:4.)

Similarly, the Government faced significant risks if it proceeded to litigate its claims. Some aspects of the Government's data were not sufficiently supported for litigation, and the prospect of a fact-intensive trial in which the Government itself would be liable, coupled with CERCLA's policy favoring settlement, provided the Government with ample incentive to compromise on a settlement with CDE. *See Se. Pa. Transp. Auth.*, 235 F.3d at 822. In fact, the Government adjusted its estimate of NRD from $239.7 million to $93.8 million in recognition of these risks. (Pl's Mem. in Supp. 18, n.36.)

### 4.       Clear Error of Judgment

Finally, Exxon argues that the proposed Consent Decree is unreasonable because the estimated response costs and NRD are based on clear errors of judgment.  (Exxon's Mem. in Opp. 38, 47.)  For example, Exxon argues that the NRD estimate is flawed because the EPA's consultant failed to conduct a baseline analysis to determine what conditions would have existed at the site if the release of hazardous substances had never occurred.  (*Id*. at 47.)  Exxon also argues that the response costs are inflated because another EPA consultant misapplied the habitat equivalency analysis (HEA) for converting environmental service losses into dollar values.  (*See* id. at 49, 50.)  For the reasons that follow, the Court finds Exxon's arguments unpersuasive.

Exxon's Argument regarding NRD is unconvincing because the Government's estimate for NRD sensibly derives from a plausible interpretation of the record.  The settling Parties in this case are called upon to estimate the value of injury and loss to an "estuarine ecosystem, . . . migratory birds, anadramous fish and threatened and endangered species, including the habitats and ecosystems that support them."  (Pl's Mem. in Supp. 13.)  In light of the complexity of this analysis, "the agency cannot realistically be held to a standard of mathematical precision.  If the figures relied upon derive in a sensible way from a plausible interpretation of the record, the court should normally defer to the agency's expertise."  *Cannons Eng'g Corp.*, 899 F.2d at 90.

The Government relied upon the work of two independent consultants—Donald MacDonald of MacDonald Environmental Sciences Ltd. and Michael Donlan of Industrial Economics, Inc.—to arrive at its initial NRD estimate of $239.7 million.  (MacDonald Report 18; Donlan Report 5.)  In light of the uncertainty and significant risks involved in litigating the case, the Government adjusted the amount of NRD from $239.7 million to $93.8 million.  (*See id*. 18, n.36.)  Additionally, the record indicates that the Government's consultants considered baseline

conditions at the Site as part of their estimate of total NRD.  (MacDonald Rebuttal Report 10, ECF No. 115.)

With regard to response costs, Exxon contends that the Government should have used the 7% discount rate called for in the EPA's Guide to Developing and Documenting Cost Estimates During the Feasibility Study (EPA Costs Guide).  (*See* Exxon's Sur-reply 2.)  This argument is unconvincing for a number of reasons.  First, as the Government correctly points out, the EPA Cost Guide is primarily intended as a guide to "comparing remedial alternatives during the remedy selection process, not for establishing project budgets or negotiating . . . settlements."  (Pl's Reply Mem. in Supp. 29.)  Second, the 7% discount rate called for in the EPA's Costs Guide is merely a recommended discount rate.  *See* EPA Office of Emergency and Remedial Response, *A Guide to Developing and Documenting Cost Estimates During the Feasibility Study*, 4-5 (July 2000). Finally, the EPA Cost Guide states that where the EPA uses a discount rate other than 7%, it should provide a "specific explanation" for the new rate.  (*Id.*)  To this end, the Government has amply explained that its discount rate "reflects how Superfund receipts are actually invested," (Koch Rebuttal Report, June 6, 2014, 4-6, ECF No. 115 (explaining that "the government is not allowed to 'play the market' or take corporate-level risks" when investing Superfund money).)  As such, the Court Concludes that the Government was justified in departing from a 7% discount rate which it believed "would guarantee inadequate funds available to complete the remediation."  (Pl's Resp. to Sur-reply 3, ECF No. 126.)

### C.       Consistency with the Goals of CERCLA

"CERCLA's real goal [is] the expeditious cleanup of hazardous waste sites." *United States*

*v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995).  However, CERCLA also has the "essential purpose

of making those responsible for problems caused by the disposal of chemical poisons bear the

costs and responsibility for remedying the harmful conditions they created." *FMC Corp. v. U.S.*

*Dep't of Commerce*, 29 F.3d 833, 840 (3d Cir. 1994) (en banc).  A consent decree approved by the

courts should be consistent with these two goals.  *See Cannons Eng'g Corp.*, 899 F.2d at 87.

### 1.       CERCLA's Goal of Expeditiously Cleansing Hazardous Waste Sites

Exxon points to the fact that the bulk of the funding provided for in the proposed Consent

Decree is contingent upon a favorable outcome in the currently ongoing state court insurance

coverage action between CDE and its insurers.  (*See* Exxon's Memo. in Opp. 53.)  Exxon argues

that the proposed Consent Decree's reliance upon contingent funds is contrary to CERCLA's goal

of expeditiously cleaning up polluted areas because the funds might never be released, or might

be released only after years of ongoing litigation.  (*id*.)

As discussed above, the settling Parties were both satisfied by an examination of CDE's

financial records that CDE lacked the resources to pay its $367,453,449 share of the cleanup costs.

(Pl's Mem. in Supp. 17-18; Def's Reply Mem. in Supp. 24.)  Thus, the Court finds that, in order

to recuperate the costs of cleaning up the site, the Government acted reasonably in hazarding a

contingent recovery from CDE's environmental insurance.

### 2.        CERCLA's Goal of Dividing Costs according to Responsibility

As the First Circuit Court of Appeals has noted,

> the proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.

*United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1087 (1st Cir. 1994).  The Court therefore proceeds with a comparison of the settling parties' apportioned costs with their respective liabilities.

The proposed Consent Decree calls for response costs and Natural Resource Damages totaling $459,316,812.  (Consent Decree 5, 6.)  Of this amount, CDE is responsible for a total of $367,453,449, or 80% of the total.  (Consent Decree 12.)  In other words, the dollar value for which CDE is liable is entirely proportional to the degree of fault attributed to CDE.

Similarly, the Government is liable for $16,282,685.  (Consent Decree 19.)  This amount includes an additional premium on the Government's share of future response costs.  (*See* Pl's Mem. in Supp. 38-39.)  The premium, which is only attached to the Government's share, is intended "to address uncertainties in anticipated future response costs" and amounts to an additional $5,259,082.  (*Id*.)  If the additional premium is factored out, then the Government's share is $11,023,603, almost exactly equivalent to the 2.4% liability allotted to the Government by the settling Parties.

### D.        Effect of the Proposed Consent Decree on State Court Litigation

Finally, Exxon asks this Court to explicitly hold that the Consent Decree—if approved by this Court—is not binding on the currently ongoing state court insurance litigation.  (Exxon's

Memo. in Opp. 55.)  The Court makes no such holding because the issue is not ripe, and therefore

not justiciable at this time.  *See In re Tutu Water Wells CERCLA Litig.*, 326 F.3d at 210, n.5

("Whether the court's findings have a preclusive effect . . . only becomes ripe for determination if

and when the Settling Parties use the findings and conclusions in other contexts.").


**IV.     CONCLUSION**

For the aforementioned reasons, the Court finds the proposed Consent Decree to be fair,

reasonable, and consistent with the goals of CERCLA.  Plaintiff's motion to enter the proposed

Consent Decree is therefore GRANTED.  An appropriate order accompanies this Opinion.


Date: October 2, 2014                          s/ Jose L. Linares
                                               JOSE L. LINARES
                                               U.S. DISTRICT JUDGE